**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

**WOMEN OF VICTORY AT VIRGINIA STATE UNIVERSITY** and **BETHEL CAMPUS FELLOWSHIP AT VIRGINIA STATE UNIVERSITY**,

*Plaintiffs*,

v.

**VICTOR K. BRANCH**, **BARON P. BRASWELL**, **JOSEPH A. CHASE JR.**, **THOMAS COSGROVE**, **ROBERT DENTON, JR.**, **PETER MCPHERSON**, **DAPHNE MEEKS**, **MORENIKE K. MILES**, **JON MOORE**, **WILLIAM MURRAY**, **VERNDELL ROBINSON**, **ROBERT THOMPSON**, **KISHORE S. THOTA**, **CLARICE TORIAN**, and **DENNIS L. VIA**, all in their official capacities as members of the Virginia State University Board of Visitors;

**MAKOLA M. ABDULLAH**, President, Virginia State University, **THOMAS WYNN**, Campus Minister, Virginia State University, **JOSEPH LYONS**, Executive Director of Career Services, Virginia State University, **JULIETTE DAVIS**, Budget Manager, Virginia State University Office of Admissions, **DELANO DOUGLAS**, Academic Intervention Coach/Supervisor, Virginia State University Academic Center of Excellence, **RODNEY HALL**, Deputy Chief of Staff, Virginia State University Office of the President, **DERRICK PETERSON**, Facility Quality Assurance Director, Virginia State University,

*Caption continued on the next page*

**Case No.** 3:26-cv-1009

**JURY TRIAL DEMANDED**

**COMPLAINT**

**SYLVIA ANDERSON**, Counselor, Upward Bound, Virginia State University, **ARIFAH GOODWIN**, Community Development Extension Specialist, Virginia State University, **CARL MURRAY**, Police Officer, Police and Public Safety, Virginia State University, **REGINA BARNETT TYLER**, Associate Vice President, Virginia State University Division of Student Success and Engagement, **ALEXIS BROOKS-WALTER**, Vice President for Student Affairs and Enrollment Management, Virginia State University, **CASEY PERRY**, Director of Student Life and Engagement, Virginia State University, all individually and in their official capacities,

*Defendants*.

## INTRODUCTION

1. The government cannot prefer Muslim and secular groups over Christian groups, cannot dictate to Christian groups how to worship, and cannot strip Christian groups of benefits for what they believe and for what they say.

2. This is First Amendment 101. It's also a class Virginia State University ("VSU") needs to take again.

3. This is evident because VSU recently instituted a Campus Ministries Policy (the "Policy") that strips religious organizations of their registered student organization ("RSO") status and accompanying benefits, brings student-led ministries under the "governance and influence" of a University-appointed Campus Minister, and yet exempts secular student groups as well as the Muslim and non-Christian student ministries on campus from the Policy's onerous requirements.

4. The burden of this Policy falls on the Plaintiff chapters of Women of Victory and Bethel Campus Fellowship. These are VSU chapters of national organizations that provide religious support to students on college campuses through Bible studies, leadership trainings and events, and numerous other opportunities for spiritual growth, both on- and off-campus.

5. Before August 6, 2026, these VSU chapters had RSO status under VSU's general policy for student organizations.

6. RSOs receive a variety of benefits, including "event planning assistance … strategic planning, problem solving, and opportunities for organizational and personal growth; access to facilities for student organization meetings and events … opportunities to publicize [the] organization's activities and events on campus … online space reservations, and leadership trainings."

7. RSOs also get to take part in VSU's Org Bazaar, an annual festival to support VSU's registered organizations during homecoming week.

8. But, on August 6, 2026, VSU's Campus Ministries office circulated its new Campus Ministries Policy, informing student leaders that "student-led ministries" could no longer affiliate with their national organizations or hold RSO status. Instead, faith-based groups (unlike secular groups) would be absorbed into VSU's Campus Ministries, subject to the sole authority of VSU's Campus Minister and a newly appointed Board of Advisors, made up of various faculty members, including a Public Safety officer, a Facility Quality Assurance Director, and the VSU President's Deputy Chief of Staff, among others.

9. Under the new Policy, Christian organizations lose access to RSO benefits, including funding, event-planning resources, and event-promotion rights. Further, the VSU Campus Minister is granted control of all Christian, student-led ministries, with complete discretion to approve or reject requests for religious meetings, events, guest speakers, and all other religious activities on campus.

10. Notably, the Policy explicitly exempts the Muslim Students Association and the VSU Community Faith Alliance—the only non-Christian religious organizations at VSU—from its authority.

11. Because "the school wants to crack down on transportation to outside churches," Defendant Wynn—the VSU Campus Minister enforcing the Policy—announced that the Policy

also eliminates the shuttles from a local church that used to transport students to and from campus on Sunday mornings.

12. There is no need to speculate about VSU's reason for this Policy. When student leaders asked Defendant Wynn why the Policy restricts only Christian groups, Defendant Wynn replied, "Because you all are faith-based … because you purport Jesus Christ and faith."

13. Although the Policy begins with a commitment to help students "grow in their respective faith traditions," Defendant Wynn clarified that the Policy applies only to Christian religious groups. Referencing the exempted Muslim Student Association, Defendant Wynn suggested that having friends in high places might help to avoid the consequences of the Policy: "[The Muslim Student Association is] with the- I think he works in the president's office, or very close to the president's office. And [the Policy is] not discrimination. It's actually to give [Muslim students] a more equal footing and a voice on campus."

14. Defendant Wynn also stated that if a new non-Christian faith-based group—such as a Hindu or Buddhist group—was established at VSU, it would be evaluated on a "case-by-case" basis for an exemption like the one granted to the Muslim Student Association.

15. When students sought further clarification on these statements, Defendant Wynn acknowledged that "there may not be a fair answer to it. The biggest answer is: it is for the betterment, it's for the benefit of the university—now and going forward—that faith-based entities come under the advisement, governance, and influence of the campus minister and the faculty advisory board."

16. Thankfully, VSU does not get the last word on fairness under the Constitution.

17. VSU's Policy appointing a single Campus Minister to govern all Christian activities, and only Christian activities, at VSU violates Plaintiffs' free exercise, establishment, expressive association, free speech, free assembly, and equal protection rights under the First and Fourteenth Amendments to the United States Constitution.

## JURISDICTION

18. Plaintiffs sue under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments to the United States Constitution.

19. Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201–02 and Federal Rule of Civil Procedure 57, injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65, damages under 28 U.S.C. § 1343, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

20. This Court has original jurisdiction over the federal claims under 28 U.S.C. § 1331.

21. This Court also has jurisdiction under 28 U.S.C. § 1343 because Plaintiffs seek to recover damages and equitable relief under 42 U.S.C. § 1983.

## VENUE

22. Venue is proper in this district and division under 28 U.S.C. § 1391(b) and Local Civil Rule 3 because all the events or omissions giving rise to Plaintiffs' claims occurred in this district.

23. Divisional venue is proper in the Richmond Division because the acts described in this complaint occurred in Chesterfield County, Virginia.

## PARTIES

### Plaintiffs

24. Plaintiffs Women of Victory at VSU and Bethel Campus Fellowship at VSU are on-campus Christian ministries made up of VSU students. They bring this action on behalf of themselves and their individual members.

25. The student members of Plaintiffs' organizations are subject to the unconstitutional Campus Ministries Policy and would have standing to challenge the Policy.

26. The interests at stake are essential to the purpose of Plaintiffs' organizations—namely, to spread the gospel of Jesus Christ at VSU through their student members.

27. Neither the claim nor the requested relief requires participation from Plaintiffs' student members.

28. Plaintiffs are student chapters of Christian ministries that serve college and university campuses across the country.

29. Plaintiff Women of Victory at VSU is a chapter of a national ministry, Women of Victory Ministries, Inc. ("WOV National").

30. WOV National is a 501(c)(3) public charity with its principal offices in Woodbridge, Virginia.

31. WOV National is a "[n]ational HBCU ministry encouraging & equipping college women to fulfill their God-given Call through the Power of Jesus."

32. Plaintiff Bethel Campus Fellowship at VSU is a chapter of a national ministry, Bethel Campus Fellowship Inc. ("BCF National").

33. BCF National is a 501(c)(3) public charity with its principal offices in Brandywine, Maryland.

34. BCF National is a national organization "established to proclaim the Lordship of Jesus Christ on high school and college campuses."

35. BCF National's mission is to "[l]ead[] Students to Christ and prepar[e] them to become reliable men and women that God can entrust with His word for the next generation."

**Defendants**

36. VSU is a public university organized and existing under the laws of the Commonwealth of Virginia.

37. Defendant Thomas Wynn is and was at all times relevant to this Complaint the Campus Minister of VSU and an ordained pastor in the United Methodist Church.

38. As VSU's Campus Minister, Defendant Wynn directly oversees VSU Campus Ministries.

39. In that role, Defendant Wynn's responsibilities include the discretionary implementation and administration of the VSU Campus Ministries Policy, including the evaluation of student requests to host religious speakers, guests, and events.

40. On information and belief, Defendant Wynn is a VSU employee, with a dedicated office on campus and a university email address.

41. Defendant Wynn regularly exercises authority delegated to him by VSU, including the implementation of the Policy.

42. Defendant Wynn asserts that the University has dictated how the Policy is to be interpreted and describes himself as being "under [the] authority" of other VSU employees, including Defendants Joseph Lyons, Regina Barnett Tyler, Rodney Hall, and President Makola Abdullah. Ex. 2 at 32 (Transcript of August 19, 2026, Meeting).

43. Defendants Lyons, Davis, Douglas, Hall, Peterson, Anderson, Goodwin, and Carl Murray make up the Campus Ministries Faculty Advisory Board.

44. Together with Defendant Wynn, these eight individuals are tasked with providing "guidance, oversight, and support" to the student ministries subject to the Policy. Ex. 3 at 2, Sec. 3.2 (VSU Campus Ministries Policy and Procedures Manual 2026–2027).

45. The Campus Ministries Faculty Advisory Board has final approval authority over all external guests, including speakers, pastors, performers, and mentors who wish to participate in a Christian event. Ex. 3 at 3, Sec. 5.

46. Regina Barnett Tyler is the Associate Vice President of the Division of Student Success and Engagement at VSU.

47. Defendant Tyler oversees VSU's Division of Student Success and Engagement, which includes Campus Ministries.

48. Defendant Tyler is Defendant Wynn's direct supervisor, responsible for the activities and policies of VSU's Campus Ministries.

49. According to Defendant Wynn, Defendant Tyler was "in on" the drafting of the new Policy. Ex. 2 at 39.

50. Alexis Brooks-Walter is VSU's Vice President for Student Affairs.

51. In this role, Defendant Brooks-Walter serves as a member of the President's cabinet and oversees offices related to student affairs, including the Division of Student Success and Engagement.

52. Defendant Brooks-Walter is Defendant Tyler's direct supervisor, responsible for Defendant Tyler's administration of the Policy.

53. Defendant Makola M. Abdullah is the President of VSU.

54. VSU's Board of Visitors has authority to appoint the chief executive officer of the institution under Va. Code Ann. § 23.1-1301(A)(3).

55. VSU's Board of Visitors has appointed Defendant Abdullah to be the "chief executive and academic officer of the University" and given Abdullah "responsibility for the operation of the University in conformity with the purposes and policies determined by the Board" Ex. 4 at 17 (VSU Board of Visitors Bylaws, Article VI).

56. Defendant Abdullah is responsible for "recommending those policies and programs that in the opinion of the President will best promote the interests of the University." *Id.*

57. Defendant Abdullah's duties as President include the recommendation of VSU's unconstitutional Campus Ministries Policy to the VSU Board of Visitors.

58. Defendants Victor K. Branch, Baron P. Braswell, Joseph A Chase Jr., Thomas Cosgrove, Robert Denton, Jr., Peter McPherson, Daphne Meeks, Morenike K. Miles, Jon Moore, William Murray, Verndell Robinson, Robert Thompson, Kishore S. Thota, Clarice Torian, and Dennis L. Via make up VSU's Board of Visitors. Ex. 5 at 1–2 (Board of Visitors webpage, "Board Membership").

59. VSU's Board of Visitors has ultimate authority over all VSU policies. Va. Code Ann. § 23.1-1301(A)(1); Ex. 4 at 18, Article IV(18).[1]

---

[1] But under Virginia law, political and religious student organizations are protected from discriminatory policies that would prevent such organizations from "ordering the organization's internal affairs, selecting the organization's leaders and members, defining the organization's doctrines, and resolving the organization's disputes are in furtherance of the organization's religious or political mission." Va. Code Ann. § 23.1–400(A).

60. Casey Perry is VSU's Director of Student Life and Engagement. Ex. 1 at 3 (VSU Student Organization Handbook).

61. In this role, Defendant Perry receives and reviews student organization applications to determine whether a student organization is eligible for RSO status.

62. Defendant Perry is responsible for approving student organizations and "maintain[ing] current and historical information on each registered student organization, its officers, advisors, and its purpose." *Id.*

63. In order to be reinstated as RSOs, Plaintiffs need Defendant Perry's approval.

64. Defendants know or should know that the Policy unconstitutionally regulates speech and religious exercise and has been applied unconstitutionally to Plaintiffs' speech and religious exercise. Although Defendants know this, the Policy remains in effect in its original form and is being enforced in violation of the First and Fourteenth Amendments to the U.S. Constitution.

65. Defendants knew, or should have known, that the Policy is discriminatory based on religion and viewpoint and was enforced against Plaintiffs. Although Defendants knew, or should have known this, they have failed to amend or repeal the policies, interpret the policies in a constitutional manner, or take any other corrective action.

66. Defendants Wynn, Lyons, Davis, Douglas, Hall, Peterson, Anderson, Goodwin, Carl Murray, Barnett-Tyler, Brooks-Walter, Abdullah, Branch, Braswell, Chase, Cosgrove, Denton, McPherson, Meeks, Miles, Moore, William Murray, Robinson, Thompson, Thota, Torian, Via, and Casey are sued in their official capacities for declaratory and injunctive relief and Defendants Wynn, Lyons, Davis, Douglas, Hall, Peterson, Anderson, Goodwin, Carl Murray, Barnett-Tyler, Brooks-Walter, Abdullah, and Casey are also sued in their individual capacities for damages resulting from the Policy and related practices challenged in this lawsuit.

67. The acts and policies alleged in this Complaint are and were attributed to Defendants who have acted and continue to act under color of a statute, regulation, or custom of the Commonwealth of Virginia.

## FACTUAL ALLEGATIONS

### I. VSU's RSO Policy

68. VSU requires all student groups wishing to be formally recognized by the University to follow a six-step process to become a registered student organization. Ex. 6 at 1 ("Becoming a Registered Student Organization").

69. First, a student interested in forming an organization must "[i]dentify at least 1 other person interested in creating the organization." *Id.*

70. The next two steps involve filling out a series of application documents and submitting them for review. *Id.*

71. In step four, the Director of Student Life and Engagement approves or denies the application. *Id.*

72. Student applicants must then make a five- to seven-minute presentation to VSU's Leadership Council. *Id.*

73. Finally, "[a]n email will be sent to prospective President regarding the approval/denial and rational[e]. If denied you may make modifications and present again with the DSLE permission." *Id.*

74. Approval is an annual process requiring submission of registration forms at the beginning of each school year. *Id.* at 2.

75. Only VSU students can create and control an RSO. *Id.* at 2.

76. While only enrolled students can be members of an RSO, "[f]aculty, staff, alumni, and others may participate in the activities and programs of student organizations as guests." *Id.* at 2.

77. Under VSU's RSO Policy, religious groups are permitted and even have particular membership rights protecting their eligibility for RSO status: "[r]eligious student organizations will not be denied registration solely because they limit membership or leadership positions to students who share the same religious beliefs." *Id.* at 2.

78. RSOs receive numerous benefits, such as "event planning assistance … strategic planning … access to facilities for student organization meetings and events … opportunities to publicize [the] organization's activities and events on campus … online space reservations, and leadership trainings." Ex. 1 at 5.

79. Plaintiff Women of Victory has been an RSO since 2019, initially registering under the name "Pinky Promise," and becoming Women of Victory in 2020.

80. Similarly, Plaintiff Bethel Campus Fellowship has been an RSO since 2018.

81. Since becoming RSOs, Plaintiffs have maintained their registered status annually.

## II. The Campus Ministries Policy

82. On August 6, 2026, VSU implemented a new Campus Ministries Policy, stripping all Christian organizations of RSO status and placing them under the exclusive "governance and influence" of VSU's Campus Ministries. Ex. 2 at 42.

83. The Policy establishes a hierarchy for governance of student-led ministries on VSU's campus. Ex. 3 at 1–2, Sec. 3. Under this system, the VSU Campus Minister, an eight-person Campus Ministries Faculty Advisory Board, and "[r]egistered student leaders representing participating ministries" govern Campus Ministries via "collaborative oversight." *Id.*

84. The Policy's alleged purpose is to "foster an authentic, loving, and supportive faith-based community for Virginia State University students." Ex. 3 at 1, Sec. 1.

85. Despite the Policy's promise of "collaborative oversight," the Policy grants no independent authority to student leaders.

86. Instead, under the Policy, all Christian RSOs are derecognized as RSOs and now "operate as campus clubs under the advisement of the VSU Campus Minister and the Faculty Advisory Board." Ex. 3 at 2, Sec. 4.1. "They are not registered social organizations," and their student members may only plan events, invite guest speakers, fundraise, or take any other action on behalf of their "campus clubs" under the strict oversight of the Campus Minister. *Id.*

87. Under the Policy, the Campus Minister controls and coordinates student access to meeting and event spaces, with absolute discretion to deny access to these resources for any reason.

All event requests from student-led ministries must be submitted to the Campus Minister for approval and contain a description of the event's purpose. Ex. 3 at 3, Sec. 5.

88. Similarly, student-led ministries that wish to fundraise must submit a proposal to the Campus Minister "for review and approval." Ex. 3 at 3, Sec. 6.

89. Student-led ministries are prohibited from collecting any funds outside of this approval process and may not keep any "unofficial bank accounts." *Id.*

90. If a student-led ministry collects any money, "[a]ll collected funds must be deposited through approved Campus Ministries' processes." *Id.* And the student-led ministry cannot spend any money unless it has "receive[d] approval according to university and ministry procedures." *Id.*

91. Guest speakers are subject to even stricter rules, with the Policy requiring two weeks' notice and approval from both the Campus Minister and the Faculty Advisory Board for all "guests, speakers, presenters, and performers." Ex. 3 at 4, Sec. 7.

92. Organizations affiliated with student-led ministries, like WOV National and BCF National, are not permitted to have any influence or involvement with student-led ministries under the Policy.

93. According to Defendant Wynn, who emailed a VSU student with further information about the Policy, "[i]nfluence, i.e., the power or ability to affect how student-led ministries think, act or have things happen, will ONLY come from the VSU Campus Minister, the VSU Campus Ministries Faculty Advisory Board, and currently enrolled VSU student leaders within VSU Campus Ministries." Ex. 7, Wynn Email at 1.

94. Under the Policy, "there will be no 'campus chapter' of an external faith-based ministry or organization at Virginia State University. … There will not be any external 'national or parent organization' for ANY student-led[], faith-based ministry at Virginia State University." *Id.* at 1–2.

95. Instead, "ALL 'advice or guidance' will come from the VSU Campus Minister and the VSU Campus Ministries Faculty Advisory Board." *Id.* at 1.

96. Although the Policy purports to apply to the whole "faith-based community" at VSU, two groups are exempted by name from the requirements: the Muslim Student Association and the VSU Community Faith Alliance. Ex. 3 at 5–6, Sec. 9–10.

97. On information and belief, these two groups are the only non-Christian, faith-based groups at VSU.

98. Unlike the Christian groups at VSU, the secular groups, the Muslim Students Association, and the VSU Community Faith Alliance can (1) independently plan, promote, and host events; (2) receive guidance and funding from external sources; and (3) gather informally without the permission of a minister.

## III. The August 19, 2026, Meeting

99. On August 19, 2026, VSU hosted an informational meeting about the Policy for the student leaders of Christian organizations.

### A. Defendant Wynn's Message about the Policy

100. Defendant Wynn spoke with student leaders for about two hours regarding the new Policy.

101. Defendant Wynn began with a sermon about unity in the body of Christ and the importance of the Policy to the University, including a discussion of the Policy's practical effects.

102. Defendant Wynn read the Policy aloud, providing detailed explanations of each section.

103. Although the Policy's language appears to govern only formal club gatherings, Defendant Wynn explained that even informal gatherings must be approved in advance: "Marcus … called me a day ago [to ask], 'Can we have prayer?' He called me Monday night, 'We wanna pray on Friday.' Pray on Friday. In the past, just get the homies together, call everybody, go to Foster [Hall] and pray. That is not what the university want." Ex. 2 at 5.

104. Defendant Wynn defended the Policy using biblical language, appealing repeatedly to the students' faith backgrounds as a reason for submitting to the Policy: "On Virginia State University's campus, we have an opportunity to do something that the Christian community

outside the campus can't seem to quite get right. We get to be one …. One body, one Lord, one faith, one baptism. One body, many members." *Id*. at 9.

105. After speaking for about twenty-five minutes, Defendant Wynn opened up the forum for questions.

**B. Defendant Wynn's Response to Q&A About the Policy**

106. Defendant Wynn became impassioned when a student in the August 19 meeting challenged the Policy, admitting, "I'm not a Christian. [I'm a]n avid follower of Jesus Christ, my risen king. Christians kill people … Christians burn crosses and hang people. People who are avid followers of Jesus don't do that. We love one another." *Id*. at 68–69.

107. Defendant Wynn then explained his vision for Campus Ministries as a one-stop shop for students seeking Christian spiritual support and growth, urging, "I would like for while you at VSU, your priority would be ministering to Jesus through Campus Ministries at VSU." *Id*. at 83.

108. When a student asked whether they would be allowed to communicate with their national organizations, Defendant Wynn said, "It's just a chop. Is it gonna be pain? Is it gonna be uncomfortable? Probably…. [K]eep the [BCF] name, but know it'll be name only. It'll be in writing …. It is a separation." *Id*. at 18–19.

109. When a student asked whether it would be acceptable to invite friends during a one-on-one conversation to a conference hosted by BCF National, Defendant Wynn said, "that kid can't fly to a conference every time they need Jesus," and suggested starting a Christian conference at VSU instead. *Id*. at 81.

110. When a student stated that the Policy seemed discriminatory, Defendant Wynn said, "I don't see how it can be discriminatory, 'cause nothing been taken from you. What's taken from you other than an outside entity?" *Id*. at 62.

111. Singling out BCF, Defendant Wynn then suggested that a legal challenge to the Policy would be sinful and unchristian, "I would have total issue with BCF [raising a legal challenge to VSU's decision to] bring everything that's faith-based under one … on-campus

directorship. Because at the end of the day … is it about your ministry or is it about the work?" *Id*. at 62–63.

112. Throughout the meeting, Defendant Wynn heavily implied that Christian ministries that refuse to submit to the Policy are not only breaking school rules but are also failing to correctly follow Jesus: "Do you think all the fraternities and sororities are in order and working together as one? We should. Why? Why? 'Cause we have Jesus Christ, Holy Spirit. We represent heaven. We're gonna do what it takes to bring heaven to earth." *Id*. at 14.

113. Defendant Wynn claimed that the Policy was actually a mandate from God himself: "The King of Kings is telling us what to do, so we should. So if somebody, if somebody gonna get hit first, it should be us, 'cause we can handle it. So you're not being picked on. You're being released to go." *Id*. at 37.

114. Defendant Wynn then claimed that the purpose of the Policy was to "release" Christian students from their outside organizations, emphasizing that outside influences are too worrisome to allow on campus: "Y'all got [Jesus], right? Mm-hmm. And if y'all tell me BCF gave y'all that, I'm gonna be really mad." *Id.*

115. Defendant Wynn instructed Plaintiffs that a faculty advisor must be physically present at all gatherings for *any* Christian event to be approved, to include everything from small prayer gatherings to Bible studies, worship nights, and pajama parties. *Id*. at 5.

116. Defendant Wynn attempted to alleviate concerns that a loss of RSO status would result in lost student organization funding, stating that he "hope[d]" the ministries would receive some "seed money," insisting that under the Policy, "you're not being suppressed, you're being released." *Id*. at 66.

117. When a student asked why Greek organizations were still allowed to maintain RSO status and meet with their national organizations, Defendant Wynn said, "Because you all are faith-based …. Because, because you purport Jesus Christ and faith. So all faith-based come under one ministry heading." *Id*. at 40–41.

118. When a student asked why the Muslim Student Association ("MSA") was given a special exemption from the Policy, Defendant Wynn said, "[T]hey have different things because they were a underserved demographic … they're just different, 'cause they're higher up. They're with the- I think he works in the president's office, or very close to the president's office. And it's not discrimination. It's actually to give them a more equal footing and a voice on campus." *Id*. at 31.

119. When a student pointed out that any new non-Christian religious organization would likely be classified as an underserved minority group, Defendant Wynn stated that if a new non-Christian faith-based group was established at VSU, it would be evaluated on a "case-by-case" basis for an exemption like the one granted to the MSA. *Id*. at 65.

120. Defendant Wynn then stated that any such group could not be advised by the Campus Minister because it would be improper for a Hindu or Buddhist group to be overseen by a Christian minister. *Id.*

121. Ironically, Defendant Wynn acknowledged the need for school policies to be inclusive while insisting that the inclusion of Christian students alongside other religious groups would somehow undermine this goal: "And at the end of the day, there are state regulations where we gotta just be inclusive to everybody. But you all are not being suppressed. You're not being suppressed." *Id.*

**C. The Policy's adverse effects on Plaintiffs' religious expression.**

122. Plaintiffs are motivated by their sincerely held religious beliefs to share the Gospel of Jesus Christ and to speak on campus on many topics from a Christian worldview, under the guidance and leadership of their respective national ministries.

123. Plaintiffs regularly host and promote Bible studies, worship nights, panel discussions, leadership trainings, retreats, and conferences in cooperation with their national organizations.

124. Many of these events occur on VSU's campus.

125. Until August 6, 2026, Plaintiffs had RSO status, granting them privileges such as access to funding, the ability to independently plan and promote events on campus by reserving meeting spaces and calendaring events, and the freedom to coordinate with their affiliated organizations.

126. The Policy stripped Plaintiffs of this status and appointed Campus Minister Thomas Wynn head of Plaintiffs' ministries.

127. Plaintiffs seek to avail themselves of RSO benefits and affiliate with their national organizations, but Defendants' Policy designates Plaintiffs as campus clubs, which are not permitted to receive any such benefits.

128. Plaintiffs also wish to gather freely and meet without the permission and oversight of the Campus Minister, but Defendants' Policy prohibits them from doing so.

129. Plaintiffs are entitled to viewpoint-neutral access to all forums available to RSOs, including access to student organization funding, the ability to affiliate with organizations external to VSU, and the ability to hold events and gatherings subject to the same rules as all other RSOs on VSU's campus.

130. Plaintiffs' student members are entitled to a viewpoint-neutral distribution of the campus involvement fees they pay that are distributed to RSOs.

131. For the 2026–27 school year, every student enrolled at VSU, including Plaintiffs' student members, is required to pay mandatory student fees, including $91 designated as a "student union" fee and $473 designated as a "student activity" fee. Ex. 8 at 44 (2026-2027 SCHEV Tuition and Fees Report).

132. Plaintiffs are expressive student organizations at VSU that seek to protect their members' constitutional rights, including their rights to free exercise, speech, and association; right against compelled speech and establishment; and right to viewpoint-neutral access to student organization funding.

133. Plaintiffs seek to (1) obtain viewpoint-neutral access to RSO status and to all benefits and privileges available to such groups, including access to campus involvement fees;

(2) affiliate with their national organizations to the same extent as every other student group on campus, and (3) organize their chapters with no more University oversight than every other student group on campus.

134. The Campus Ministries Policy prevents Plaintiffs from the following benefits available to all others RSOs: "professional event planning assistance, access to student organization advisors [for] goal setting, strategic planning, problem solving, and opportunities for organizational and personal growth; access to facilities for student organization meetings and events, and opportunities to publicize [the] organization's activities and events on campus" as well as "a student organization mailbox, online space reservations, and leadership trainings and leadership resources." Ex. 1 at 5.

135. On information and belief, the mandatory student fees paid by Plaintiffs' student members are allocated to other RSOs to fund expression that Plaintiffs and their members do not agree with and would not voluntarily fund.

136. In addition to being denied comparable access to the physical forums open to RSOs, Plaintiffs and their members are denied access to RSO funds that are allocated from the campus involvement fees Plaintiffs' student members pay because Defendants have denied them RSO status.

137. Thus, Plaintiffs' student members are compelled to support—through mandatory student services fees—ideas and philosophies that they oppose, and they are denied access to the funds they pay to support RSOs.

138. As a result of the Policy, Plaintiffs can only hold events if they follow a burdensome approval process, which is subject to the Campus Minister's unlimited discretion.

139. Indeed, Plaintiff Bethel Campus Fellowship has ceased its on-campus activities because of the Policy and shared its concerns about the Policy's impact in a letter to Defendant Wynn.

140. The Policy requires a faculty advisor to be physically present and oversee all faith-based events.

141. Because the Policy grants authority to faculty advisors to control the content and administration of religious events on campus, Plaintiffs feel that to continue holding events under the new Policy is to accept VSU's "governance and influence" on matters of religious faith—specifically, to submit to the Policy is to affirm that the Campus Minister has authority to determine what beliefs and practices are acceptable in the Christian faith.

142. Despite strong disagreement with the Policy, Women of Victory has continued to hold weekly Bible studies—which Defendant Wynn oversees and attends, despite students' requests for a female advisor.

143. Women of Victory is required to go through the Campus Minister to reserve space and plan events.

144. Women of Victory members are required to inform the Campus Minister before holding any meetings on campus, even for informal hangouts, despite the fact that informal gatherings of Christian students are not proscribed under the Policy in writing.

145. Since the Policy was implemented, and despite Women of Victory's attempt to continue meeting while following the Policy's strict rules, Defendant Wynn personally texted the Women of Victory president to reprimand her for allegedly breaking the Policy by holding an informal "get together" over a holiday weekend.

146. Women of Victory and Defendant Wynn have disagreed in the past on matters of church doctrine.

147. In April 2026, before the Policy took effect, Defendant Wynn attempted to physically halt and disrupt a religious "deliverance" event hosted by Women of Victory because he personally disagreed with the subject matter of the event.

148. Forcing Christian student organizations to submit to a single religious figure employed by a public university violates religious students' constitutional rights.

## IV. Plaintiffs are suffering ongoing harm from the Policy

149. Because of this Policy, Plaintiffs credibly fear that Defendants will punish Plaintiffs if Plaintiffs express their religious beliefs at school without express permission from the Campus Minister.

150. On September 7, 2026 (Labor Day), Women of Victory met in a common area on campus for an informal "pajama party" to finish out the long weekend.

151. When Defendant Wynn learned that this had taken place, he sent a text message to one of Women of Victory's student leaders reprimanding her for gathering with other Christian students without his permission, even though the Policy does not specify that students must obtain event approval for informal hangouts.

152. When the student replied that the pajama party was just a time for students to casually get together in fellowship, not a true "event," Defendant Wynn replied that even causal get-togethers must be communicated in advance, noting that Women of Victory did not have his permission to secure a meeting space.

153. Defendants purport to allow Plaintiffs to "keep the name" of their national organizations, "but know it'll be name only." Ex. 2 at 19.

154. Plaintiffs' organizations do not allow unaffiliated groups to hold themselves out as chapters of the larger organization, so Plaintiffs are being forced to choose between disobeying the Policy—continuing to affiliate with BCF National and WOV National despite the prohibition—or following the Policy—dissolving the entire ministry and submitting to the religious authority of the University-appointed Campus Minister.

155. In the August 19 meeting, Defendant Wynn promised, "I promise you I'm here to listen, and I'm here to change what I can change." Ex. 2 at 47.

156. Despite this, Defendant Wynn dismissed all student concerns about the Policy and indicated that there could be no reconsideration of its terms, especially the ban on affiliations with national organizations; "But the stuff that can't be changed is these governmental things. That can't be changed." *Id.*

157. Since the Policy went into effect, Plaintiffs have sought to express their religious beliefs on campus, but Defendants have blocked those efforts.

158. Plaintiffs wish to be reinstated as RSOs so they can use RSO benefits to carry out their missions on campus on the same basis as other RSOs.

159. Plaintiffs wish to hold Bible studies, prayer nights, and informal gatherings without following the burdensome approval process and scheduling around the availability of a faculty advisor who is under no obligation to ensure the event occurs.

160. Plaintiffs wish to publicly announce their affiliations with BCF National and WOV National but have been forbidden from even communicating with these or any other off-campus ministries.

161. Plaintiffs wish to represent their organizations at the large Org Bazaar that takes place every October during Homecoming Week celebrations.

162. But for the Policy, Plaintiffs would still be RSOs and would immediately resume holding regular Bible studies, prayer nights, and events in coordination with their national organizations.

**COUNT I**
**First Amendment: Free Exercise**
**42 U.S.C. § 1983**

163. Plaintiffs reallege all matters set forth in paragraphs 1–162 and incorporate them herein.

164. Plaintiffs are motivated by their sincerely held religious beliefs to speak on campus on many topics from a Christian worldview. Plaintiffs believe their on-campus speech is a way to share the Gospel of Jesus Christ with non-Christians and a way to disciple and equip other Christians on campus to grow and mature in their faith.

165. The First Amendment's Free Exercise Clause guarantees religious believers–at a bare minimum—equal treatment.

166. It is clearly established that law or policy "may not discriminate against 'some or all religious beliefs.' Nor may a law regulate or outlaw conduct because it is religiously motivated. And … The Free Exercise Clause protects against laws that 'impose[ ] special disabilities on the basis of ... religious status.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 461 (2017) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532–33 (1993)).

167. By discriminating against Plaintiffs based on their religious beliefs, Defendants are violating Plaintiffs' clearly established free exercise rights.

168. A public university policy that burdens religious exercise and is not both neutral and generally applicable must satisfy strict scrutiny.

169. And a public university policy that targets and shows hostility to religious beliefs is never permissible.

170. Defendants' application of the Policy burdens religious exercise because Defendants apply this Policy to include specific religious viewpoints, while excluding other religious viewpoints from its scope.

171. The Policy, facially and as-applied, is not neutral or generally applicable.

172. Rather, Defendants have specifically targeted Plaintiffs' affiliation with national Christian organizations and distinguished Christian organizations from secular organizations and from other religious organizations.

173. Secular groups can affiliate with national organizations, fundraise and apply for school funding, and even receive professional event planning assistance, among other things, as a benefit of their RSO status, but Christian groups are categorically barred from accessing these benefits.

174. Defendants' Policy favors non-Christian religious groups and secular groups as Defendants did not restrict any other students based on their religious beliefs or lack thereof. The orders and the Policy thus flunk neutrality.

175. Defendants' Policy is not generally applicable because it exempts secular organizations while applying strict requirements to religious organizations, because it provides individualized exemptions for non-Christian religious groups, and because it provides individualized assessments that allow for case-by-case determinations of whether the Policy applies.

176. The Policy and Defendants' enforcement actions demonstrate animus toward Christian students on VSU's campus.

177. The Policy specifies that only Christian groups will be subject to its restrictions.

178. When students challenged the Policy, Defendant Wynn declared that he does not consider himself a Christian because "Christians kill people."

179. Defendant Wynn also claimed that the Muslim students were "higher up" compared to the Christian students because of their status as an "underserved minority."

180. By putting Defendant Wynn in charge of all Christian ministries at VSU and restricting Plaintiffs' relationships with their national organizations, Defendants have specifically targeted Christians for punishment.

181. Defendants admit that the purpose of the Policy is to control Christian groups while all other religious and secular groups are permitted to share their beliefs and affiliations on campus without restriction.

182. Defendants' application of the Policy does not support any legitimate, much less compelling, government interest and is not narrowly tailored to any such interest.

183. Defendants' application of this Policy thus violates the Free Exercise Clause of the First Amendment.

184. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

**COUNT II**
**First Amendment: Church Autonomy**
**42 U.S.C. § 1983**

185. Plaintiffs reallege all matters set forth in paragraphs 1–162 and incorporate them herein.

186. Government officials may not interfere with a religious organization's decisions on matters of faith, discipline, internal governance, or the selection of those who carry out its religious mission. *See Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 737 (2020); *Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94, 116 (1952).

187. By implementing the Policy, Defendants are interfering with Plaintiffs' religious autonomy and entangling VSU in Plaintiffs' religious decision-making processes in violation of the First Amendment.

188. Plaintiffs are religious organizations engaged in religious decision-making and ministry, and they apply their religious beliefs and doctrines to their ministry to Christian students enrolled at VSU. These decisions constitute matters of internal governance, faith, doctrine, and practice.

189. The Policy targets and interferes with Plaintiffs' religious governance and decision-making.

190. The Policy's ban on external affiliations and requirement that a faculty member be present at all Christian gatherings is an attempt to influence Plaintiffs' decisions regarding faith and doctrine.

191. This violates both Religion Clauses, which "protect the right of churches and other religious institutions to decide matters "'of faith and doctrine' without government intrusion.... State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion. The First Amendment outlaws such intrusion." *Our Lady of Guadalupe Sch.*, 591 U.S. at 746.

192. Under the Establishment Clause, the government cannot exercise authority over matters of religious governance, doctrine, and internal organization.

193. The Policy infringes Plaintiffs' right to govern themselves according to their religious principles, frame their policies and doctrines, and conduct their religious ministries according to those religious principles without government interference.

194. The First Amendment's Establishment Clause "complement[s]" the Free Exercise Clause, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 533 (2022), and protects religious organizations from "state interference [on] matters of [internal] government," *Kedroff*, 344 U.S. at 116. Defendants' attempts to seize control of all Christian ministries at VSU and control the nature and subject matter of all events violates church autonomy.

195. Forcing students to "chop" their religious affiliations and submit to a government-appointed religious leader violates church autonomy.

196. Defendants have taken religious authority from Christian student organizations and assigned that authority to a University-approved minister.

197. Every time a student leader from a Christian organization wishes to plan a prayer night, fundraise, invite a fellow student to church, hold a pajama party in a residence hall, start a Bible study, or invite a guest speaker to a weekly meeting, that student must obtain the government's stamp of approval.

198. The Policy permits Defendant Wynn to withhold that stamp of approval with unbridled discretion.

199. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

## COUNT III
## First Amendment: Establishment Clause
## 42 U.S.C. § 1983

200. Plaintiffs reallege all matters set forth in paragraphs 1–162 and incorporate them herein.

201. It is clearly established that the Establishment Clause of the First Amendment prohibits public officials from declaring a preference for one denomination or religion over another, preferencing religion over nonreligion, and denying the right of religious groups to self-determination. *See Cath. Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247 (2025); *Larson v. Valente,* 456 U.S. 228, 244 (1982).

202. By claiming exclusive authority to "govern and influence" Christian groups—but not any other secular or religious groups—Defendants have shown a clear religious and denominational preference, and they have shown a preference to nonreligious groups over religious groups.

203. While "faith-based" groups can no longer obtain RSO status or take any action without the express permission of the Campus Minister, secular organizations are freely permitted to become RSOs, plan and host events, and fundraise with significantly less oversight.

204. Defendant Wynn stated that the Policy is in place for religious groups but not secular ones "because you all are faith-based."

205. This clear preference for nonreligious campus organizations violates the Establishment Clause.

206. Only Christian groups are subject to the new regime.

207. The Policy makes specific exemptions for the Muslim Student Association and the VSU Community Faith Alliance, the only non-Christian religious groups on campus.

208. By drafting a Policy for faith-based organizations that specifically excludes the only non-Christian religious groups at VSU from its control, Defendants have shown a clear preference for Muslim students over Christian students.

209. By appointing a single pastor as head over all Christian ministries in an attempt to homogenize Christian practices on campus, Defendants have shown an unacceptable denominational preference.

210. Defendant Wynn has exclusive authority and complete discretion to control all Christian events on campus.

211. Defendant Wynn has obstructed certain Christian events even when they do not violate the plain language of the Policy.

212. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

**COUNT IV**
**First Amendment: Free Speech**
**42 U.S.C. § 1983**

213. Plaintiffs reallege all matters set forth in paragraphs 1–162 and incorporate them herein.

214. When the government opens a forum for public expression, it is clearly established that the Free Speech Clause of the First Amendment prohibits the government from discriminating based on viewpoint, or a speaker's motivating ideology, opinion, or perspective. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995).

215. Within that same forum, the Free Speech Clause requires the government to adequately limit the discretion of university officials who grant (or deny) RSO status or access to student fee funding through narrow, objective, and definite standards to protect against viewpoint discrimination.

216. VSU created a forum by recognizing student organizations.

217. Because VSU says its student organizations exist "to provide students with opportunities to participate in activities that develop their intellectual, emotional, spiritual, physical, and professional abilities," VSU's decision to deny RSO benefits to Christian organizations on the basis of their religious beliefs is wholly unreasonable.

218. VSU created a forum by compelling students to pay a mandatory campus involvement fee and distributing that fee to student organizations for expressive purposes. By forcing Plaintiffs' student members to pay campus fees that are used to fund student organizations, Defendants unconstitutionally compel these students to subsidize speech with which they disagree.

*See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 894 (2018) (finding that "the compelled subsidization of private speech seriously impinges on First Amendment rights.").

219. Defendants have engaged in viewpoint discrimination against Plaintiffs by stripping Plaintiffs of RSO status because of their religious viewpoint.

220. Pursuant to the Policy, Defendants have singled out Plaintiffs' expression and prevented them from engaging in religious expression with their national organizations.

221. Defendants' Policy has also chilled Plaintiffs from engaging in religious expression with other students at VSU.

222. Defendants have thus censored Plaintiffs based on Plaintiffs' religious views and on the content of their speech.

223. Indeed, Defendants allow on-campus speech on a wide variety of content. Defendants have not censored students who express views on secular topics or non-Christian religious topics.

224. Defendants' censorship does not serve any legitimate, much less compelling government interest, nor is it narrowly tailored to any such interest.

225. In addition to failing to be a content-neutral restriction, Defendants' Policy is unconstitutional because it is not narrowly tailored to serve a significant government interest and does not leave open ample alternative channels of communication.

226. The Policy also grants Defendants unbridled discretion to restrict protected speech.

227. By permitting Defendants to control the content of religious programming on campus and to refuse permission to any planned event, message, or speaker, Defendants have license to enforce the Policy against religious views or content they deem to be controversial or unpopular.

228. Defendants cannot justify the Policy to the extent that it authorizes enforcement against students solely based on a student's religious beliefs.

229. By giving complete authority to the Campus Minister and Faculty Advisor Board to control the flow of religious speech on VSU's campus, VSU can punish virtually any protected religious expression as a violation of the Policy.

230. To the extent that Defendants applied the Policy to Christian organizations at VSU, Defendants have unconstitutionally discriminated against Plaintiffs under this Policy because Plaintiffs engaged in protected expression.

231. The Policy and Defendants' enforcement of that Policy are therefore unconstitutionally discriminatory based on content and viewpoint.

232. By forcing Plaintiffs to choose between exercising their First Amendment rights and accessing benefits generally available to all other student organizations, Defendants have penalized Plaintiffs for engaging in protected religious expression and association.

233. The government may not condition a benefit on the relinquishment of a constitutional right.

234. Defendants' demand that Plaintiffs sever ties with their national ministries and submit to the exclusive religious authority of a University-appointed Campus Minister to participate in religious activities on campus is exactly such a condition.

235. Defendants have imposed unconstitutional conditions on Plaintiffs' access to RSO status and its associated benefits—including student organization funding, event planning resources, meeting space, and the ability to publicize activities on campus—by requiring Plaintiffs to surrender their constitutionally protected rights to free exercise, free speech, expressive association, and affiliation with their national religious organizations as a prerequisite to receiving those benefits.

236. The Policy is also overbroad because it extends far beyond VSU's legitimate interest in coordinating campus facilities, requiring prior government approval for virtually all religious expression by Christian students—including informal, private gatherings in common areas where no university resources are required.

237. By granting the Campus Minister unreviewable discretion to approve or deny any gathering, event, speaker, or activity involving Christian students, the Policy sweeps in a substantial amount of constitutionally protected speech and religious exercise that bears no relationship to any legitimate administrative purpose.

238. The Policy also permits Defendants to retaliate against Plaintiffs for exercising their First Amendment rights without prior approval from the Campus Minister.

239. Indeed, Defendants have enforced the Policy against students engaging in nothing more than an informal social gathering in a common area, demonstrating that the Policy's reach extends to the most basic and protected forms of student association and expression.

240. Defendant Wynn personally admonished a student leader for hosting an informal social gathering that did not violate the Policy's own terms—this retaliatory action was motivated by Plaintiffs' protected speech and religious exercise and was sufficient to deter a person of ordinary firmness from continuing to engage in that protected activity.

241. Defendants' enforcement of the Policy has in fact chilled Plaintiffs' speech, causing Plaintiff Bethel Campus Fellowship to cease holding Bible studies, worship events, and other religious gatherings on VSU's campus.

242. The Policy, both facially and as-applied, violates the Free Speech Clause of the First Amendment.

243. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

## COUNT V
## First Amendment: Expressive Association
## 42 U.S.C. § 1983

244. Plaintiffs repeat each of the allegations in paragraphs 1–162.

245. Implicit in the free exercise, speech, and assembly rights the First Amendment guarantees is a corresponding right to associate with others in the pursuit of a wide variety of religious, political, social, economic, educational, and cultural ends.

246. Plaintiffs engage in expression and expressive activities as a group.

247. Plaintiffs believe their on-campus speech is a way to share the Gospel of Jesus Christ with non-Christians and a way to disciple and equip other Christians on campus to grow and mature in their faith.

248. Plaintiffs' chapters were established by students seeking to express their faith with the guidance and assistance of trusted national leadership.

249. Students willingly seek out organizations that align with their personal religious beliefs and goals.

250. Compelling all Christian students to forego affiliations with their chosen religious group and submit to the leadership of a single Campus Minister—who may or may not share the particular religious beliefs of any given student—would force Plaintiffs to associate with and promote a message Plaintiffs disagree with.

251. Compelling Plaintiffs to do so also runs contrary to the chapters' expressive purposes, including "[l]eading Students to Christ and preparing them to become reliable men and women that God can entrust with His word for the next generation."

252. Compelling Plaintiffs to associate with leaders who do not subscribe to and live out the chapter's beliefs jeopardizes the chapters' relationship with their national organizations and deprives the chapters of the opportunity to associate with likeminded Christians.

253. Defendants' Policy and actions banning faith-based groups from affiliating with external organizations violates the Expressive Association Right of the First Amendment to the United States Constitution, both facially and as applied.

254. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

**COUNT VI**
**First Amendment: Free Assembly**
**42 U.S.C. § 1983**

255. Plaintiffs reallege all matters set forth in paragraphs 1–162 and incorporate them herein.

256. The First Amendment's Assembly Clause protects Plaintiffs' ability to peaceably assemble and engage in otherwise lawful religious worship and speech activities with persons of their choosing.

257. The First Amendment also protects Plaintiffs' ability to decline to assemble with others.

258. Plaintiffs engage in protected assembly when their student members gather together, host events and Bible studies, and attend off-campus events with their national organizations because Plaintiffs believe that these activities and organizations are a witness of their faith and thus inherently expressive.

259. As applied to Plaintiffs, the Policy prohibits Plaintiffs from engaging in their desired assembly; compel Plaintiffs to engage in assembly they find objectionable; inhibit Plaintiffs from forming expressive associations and assemblies they desire to form and from avoiding expressive associations and assemblies they want to avoid, and regulate association and assembly based on content, viewpoint, and speaker identity.

260. Plaintiffs have not and cannot engage in certain assembly because of the Policy.

261. If not for the Policy, Plaintiffs would immediately begin to again engage in this protected speech, expressive association, and assembly.

262. Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing on Plaintiffs' free-assembly rights.

263. Accordingly, as applied to Plaintiff, the Policy violates the First Amendment's protections for free assembly.

264. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

**COUNT VII**
**Fourteenth Amendment: Equal Protection**
**42 U.S.C. § 1983**

265. Plaintiffs reallege all matters set forth in paragraphs 1–162 and incorporate them herein.

266. The Equal Protection Clause prohibits the government from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

267. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike" and prohibits the government from creating "arbitrary or irrational" distinctions between classes of people. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 446 (1985).

268. The Policy treats Plaintiffs differently based on a suspect class: their religion.

269. The Equal Protection Clause prohibits discrimination on the basis of religion and prohibits Defendants from applying the Policy to Plaintiffs on the basis of their religious character, beliefs, or exercise but not applying the same Policy to any secular groups.

270. By enforcing the Policy against Plaintiffs based on their religious beliefs, Defendants demand that Plaintiffs surrender their religious character, beliefs, or exercise to engage in ministry at VSU.

271. Defendants enforce the Policy in a discriminatory manner by forcing Christian organizations to adhere to strict rules and stripping them of RSO status while allowing other organizations to avoid these same requirements and punishments.

272. Defendants' actions, Policy, and practice also treat Plaintiffs less favorably than similarly situated Muslim students.

273. Defendants do not advance any compelling or even valid interest in a narrowly tailored way by infringing Plaintiffs' rights under the Fourteenth Amendment's Equal Protection Clause.

274. As applied to Plaintiffs, the Policy violates the Fourteenth Amendment's Equal Protection Clause.

275. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

**PRAYER FOR RELIEF**

Plaintiffs pray for relief and judgment as follows:

1. A declaratory judgment that Defendants' Campus Ministries Policy and related practices violate Plaintiffs' rights under the First and Fourteenth Amendments facially and as-applied as delineated above;

2. A preliminary and permanent injunction prohibiting Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing Defendants' Campus Ministries Policy, including but not limited to the Policy's speaker- and event-approval restrictions, the informal gathering restrictions, the fundraising approval requirement, the denial of RSO status to Christian organizations, and the ban on external affiliations;

3. A preliminary and permanent injunction prohibiting Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf from charging Plaintiffs campus involvement fees in any future semesters so long as the viewpoint-discriminatory system created by Defendants' Campus Ministries Policy remains in place.

4. Award compensatory damages against Defendants sued in their individual capacities, including but not limited to damages for (a) the denial of RSO benefits and funding to which Plaintiffs were entitled while Plaintiffs' members were compelled to pay mandatory campus

involvement fees; (b) other economic losses caused by the Policy; and (c) other injuries suffered by Plaintiffs and their members as a result of Defendants' unconstitutional conduct;

5. Award nominal damages for the violation of Plaintiffs' constitutional and statutory rights;

6. Award reasonable costs and expenses of this action, including court costs and reasonable attorneys' fees as provided by 42 U.S.C. § 1988; and

7. Grant of any other relief the Court deems equitable and just in the circumstances.

Respectfully submitted this 24th day of September, 2026.

*/s/ Tyson C. Langhofer*
Tyson C. Langhofer
VA Bar No. 95204
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, Virginia 20176
T: (571) 707-4655
F: (571) 707-4656
tlanghofer@adflegal.org

**Counsel for Plaintiffs Women of Victory at Virginia State University and Bethel Campus Fellowship at Virginia State University**

**DEMAND FOR TRIAL BY JURY**

Plaintiffs Women of Victory at Virginia State University and Bethel Campus Fellowship at Virginia State University hereby demand a trial by jury for all issues so triable.

*/s/ Tyson C. Langhofer*

Tyson C. Langhofer

**Counsel for Plaintiffs Women of Victory at Virginia State University and Bethel Campus Fellowship at Virginia State University**